**INDEPENDENT INSURANCE AGENTS OF HUNTSVILLE, INC.,**
Petitioner–Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent–Appellee.

No. 92–6494.

United States Court of Appeals,
Eleventh Circuit.

Aug. 20, 1993.

H. Harold Stephens, John R. Wynh, Huntsville, AL, petitioner-appellant.

Gary Allen, Tax Div., Annette M. Wietecha, Teresa T. Milton, Gilbert S. Rothenberg, Dept. of Justice, Washington, DC, for respondent-appellee.

Before BLACK and CARNES, Circuit Judges, and RONEY, Senior Circuit Judge.

BLACK, Circuit Judge:

Independent Insurance Agents of Huntsville, Inc. (IIAH) is a business league that has been exempt from federal taxation under § 501(c)(6) of the Internal Revenue Code[1] since 1975. Its membership is open to Madison County, Alabama insurance agencies, licensed brokers, and licensed agents who represent at least two fire and/or casualty companies on a commission basis.

In 1989, the Internal Revenue Service (IRS) asserted that IIAH had tax deficiencies on commissions earned from sales of insurance to public entities for the fiscal years ending March 31, 1985; March 31, 1986; and March 31, 1987. The IRS determined that the commission income constituted business income unrelated to its tax-exempt purposes and, therefore, income that was subject to tax under the provisions of § 511(a). The IIAH filed a petition in tax court challenging this determination. After trial, the tax court found that IIAH was subject to the tax on unrelated business income. Further, the court found that IIAH was not entitled to deductions in excess of those allowed in the notice of deficiency.[2] For the reasons stated in this opinion, we affirm.

## I. BACKGROUND

### A. Initial Exemption

In January 1975, the IRS issued IIAH a determination letter stating that IIAH qualified for tax-exempt treatment as a business league under § 501(c)(6).[3] The IRS cautioned, however, that "[i]n this letter we are not determining whether any of your present or proposed activities are [an] unrelated trade or business as defined in section 513 of the Code."

---

**1.** All subsequent section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

**2.** The tax court's opinion is unofficially reported at 63 T.C.M. (CCH) 2468 (1992).

**3.** Although the principles involved in determining whether an organization carries on an unrelated trade or business are similar to those that apply in determining whether the organization qualifies for tax-exempt status, we are not examining the effect of IIAH's public insurance activi-

ties on its present tax-exempt status under § 501(c)(6). The conduct of an activity for profit does not necessarily cause loss of exempt status. *See, e.g., Texas Mobile Home Ass'n v. Commissioner,* 324 F.2d 691 (5th Cir.1963). Neither do we address the issue of the propriety of the issuance of the determination letter by the IRS in the first instance, when the IRS itself acknowledged in a letter dated August 23, 1974 that IIAH's income was "primarily received" from carrying on public insurance activities.

## B. Insurance Sales to Public Entities

IIAH's chief source of income (99%)[4] is the commission income that is generated by its members' sales of insurance coverage to local public bodies such as the Huntsville Public Library; the Huntsville/Madison County Jetport; the City of Huntsville, Alabama; the Railroad Authority; Madison County, Alabama; and others. In order to generate this income, the Association Account Assignment and Review Committee (AAARC) would assign each public entity in the Huntsville area to an individual member or member agency. The member in turn would provide an insurance policy for the public entity. Approximately one-half of IIAH's eighteen members wrote public insurance policies. At the time of trial, IIAH members were servicing ten public accounts.

Once an IIAH member was assigned a public entity, it would typically attempt to determine the types of insurance coverage the entity needed and solicit the insurance companies it represented in order to obtain coverage for the entity. After evaluating the various insurance policies that were available, the member then selected and presented the policy to the public entity. In most cases, the public entity agreed to purchase the recommended insurance policy. The commission paid on the policy was then split between IIAH and the member, with IIAH receiving 40–60% of the proceeds.

## C. The Audit

For fiscal tax years 1985, 1986, and 1987, IIAH filed information returns for organizations exempt from tax, attesting each year that it had no unrelated business gross income of $1,000 or more. Each year IIAH attached schedules to its returns reflecting retained commissions of $111,896; $123,436;

and $145,893, respectively. After audit, the IRS determined that the retained commissions were unrelated business taxable income (UBTI). The IRS issued a notice of deficiency advising IIAH of tax due in the amounts of $21,655; $25,642; and $32,764. IIAH challenged these deficiencies on the basis that the commissions generated contributed importantly, and were substantially related, to its exempt purposes and, hence, were not UBTI.

## II. DISCUSSION

In order to qualify for tax-exempt status, an organization must be organized and operated for the purposes set forth in § 501(c)(6). The organizational test is met if the organizational documents, such as its charter and bylaws, meet the requirements of § 501(c)(6), which are to insure that the association is not organized to make a profit or to allow the inurement of earnings to private persons. § 501(c)(6); Treas.Reg. § 1.501(c)(6)–1. If an organization is found to be organized for tax-exempt purposes, it must then demonstrate that it actually conducts activities that entitle it to exemption.

## A. Organizational Test

The general nature of the provisions in IIAH's Articles of Incorporation[5] do not specifically contemplate sales of insurance to public entities. No reference to public insurance trade or commerce is made. The Articles are general and beneficent in nature, conceiving exempt purposes for IIAH which are intangible. IIAH's bylaws also do not contemplate the sale of public insurance but they do provide for the creation of the AAARC, which has the authority to supervise other public insurance activities. Its

---

4. Dues of $10 per year per member account for the balance.

5. Article III of IIAH's Articles describe its exempt purposes:

[T]o improve conditions in the insurance business; to support and foster sound and ethical practices in insurance writing; to promote the continued education of its members with respect to the insurance business; to afford a medium for the exchange of views, information, and experience among its members; to

inculcate and enforce high moral principles in the transaction of insurance business; to support and cooperate with the Insurance Department of the State of Alabama in the enforcement of laws pertaining to insurance; to advance the public interest through high insurance standards and practices; to encourage fire prevention, public safety, conservation of lives and property; and to secure and maintain good relations between the insurance industry and the insuring public.

primary function is to assign public accounts to qualified members.[6]

Further, when IIAH applied for exempt status in May 1974, it was required to attach a brief statement describing the specific purposes for which it was formed, without referring to the Articles of Incorporation or by-laws. IIAH stated that "[t]he corporation was formed to ... [o]versee the writing of insurance for public authorities to insure that such authorities are receiving the best insurance protection and service available."[7]

In sum, the specific exempt purposes visualized by the drafters of IIAH's charter, bylaws and exemption application are altruistic, not commercial in nature. The actions anticipated are to oversee, to supervise, to assign, not to sell, to trade, to profit.

### B. Operational Test

#### 1. Unrelated Business Taxable Income

■ Income received by a tax-exempt organization constitutes UBTI if the activity:

(a) constitutes a trade or business;

(b) is regularly carried on; and

(c) is not substantially related to [the organization's] tax-exempt purposes.

*United States v. American College of Physicians*, 475 U.S. 834, 838–39, 106 S.Ct. 1591, 1594, 89 L.Ed.2d 841 (1986); *United States v. American Bar Endowment*, 477 U.S. 105, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986); §§ 511(a), 512(a); Treas.Reg. § 1.513–1(a).[8] IIAH concedes that the activity constitutes a trade or business that is regularly carried on. This appeal, then, centers on the third prong of the operational test identified above: whether the activity is substantially related to its tax-exempt purposes.

■ An organization's need for funds to further its purposes does not create the necessary substantial relationship. Treas.Reg. § 1.513–1(d)(2). The conduct of the business activities must have a causal relationship to the achievement of exempt purposes, other than through the production of income, and such causal relationship must be a substantial one. *Id.* For such a substantial relationship to exist, the business activities must contribute importantly to the accomplishment of the organization's exempt purposes. *Id.*

■ To determine whether IIAH's public insurance account activity is substantially related to its exempt purposes, we must examine "the relationship between the business activities which generate the particular income in question and the accomplishment of the organization's exempt purposes." *Id.* § 1.513–1(d)(1). In this determination, "the size and extent of the activities involved must be considered in relation to the nature and extent of the exempt function which they purport to serve." *Id.* § 1.513–1(d)(3). Each case depends upon the particular facts and circumstances involved. *Id.* § 1.513–1(d)(2).

The exempt purpose of a business league is to promote some common business interest, "not to engage in a regular business of a kind ordinarily carried on for profit." Treas. Reg. § 1.501–1(c)(6). Exempt activities "should be directed to the improvement of business conditions of one or more lines of business as distinguished from the perfor-

---

6. Qualified members are those who have been licensed to write insurance for a minimum of three years, are in good standing with IIAH, have been active in at least six IIAH membership meetings, have the ability to properly service the public account, and have adequate access to markets. At the time of trial, IIAH had approximately eighteen qualified members.

7. Other purposes for which IIAH was formed, according to its exemption application, were to "provide a forum where independent insurance agents may meet and exchange ideas concerning the casualty insurance business ... [to] provide a vehicle whereby the insurance agents may contribute to the public benefit through programs such as safety education ... [to] provide a liaison between the independent insurance agents and other persons and businesses in the Huntsville community ... [to] promote professionalism in the casualty insurance business among the members of the corporation...."

8. Treasury Regulations are a great persuasive force because of the expertise of the IRS in administering our nation's tax laws. *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 656 (5th Cir.1968). Consequently, we must defer to the regulations unless they are unreasonable or plainly inconsistent with the Code. *Commissioner v. Portland Cement Co.*, 450 U.S. 156, 101 S.Ct. 1037, 67 L.Ed.2d 140 (1981).

mance of particular services for individual persons." *Id.*

## 2. Application to IIAH

The tax court found no evidence of regular independent oversight by AAARC of the servicing of public accounts, nor any attempt by AAARC to obtain feedback on the handling of an account by preparing summaries of the information obtained, as provided in IIAH's bylaws. The tax court also did not find any evidence that the best insurance was provided to the public authorities at the lowest cost, that political influence in the public insurance procurement process was eliminated, that difficult to insure risks were provided, or that coverage was coordinated to reduce policy gaps and conflicts. In short, the tax court found that IIAH's public insurance activities were not substantially related to the accomplishment of its exempt purposes.[9]

In our review to determine whether income is substantially related to the tax-exempt purposes, we look to the conduct of the trade or business and direct our focus to the manner in which the tax-exempt organization operates its business. *American College of Physicians*, 475 U.S. at 834, 106 S.Ct. at 1591, 89 L.Ed.2d at 841 (1986).

IIAH's conduct does not evince an intention to use its public insurance activities to contribute importantly to the improvement of conditions in the insurance business or to further its exempt purposes. Instead, its conduct indicates that raising revenue was its primary concern. For their efforts, IIAH members received a sizable commission. IIAH's method of operation ensured a steady stream of public insurance business for its select group. *See Louisiana Credit Union League v. United States*, 693 F.2d 525, 536 (5th Cir.1982) (business activities generating income by a tax-exempt entity must "produce

inherently group benefits that accrue to its members *qua* members," rather than "individual benefits" to its members).

For fifteen years, IIAH has sheltered income under the auspices of its tax-exempt status. It has paid for legislative meetings, conventions, dues, continuing education seminars, advertising and travel expenses for its members with tax-free dollars. Although IIAH has not actually distributed its profits to members as dividends or interest, these profits made possible the performance of nonprofit-making member services that would not otherwise have been offered. This could be perceived as an indirect distribution of retained earnings to members. *See Fort Worth Grain & Cotton Exchange v. Commissioner*, 27 B.T.A. 983 (1933); *Northwestern Jobbers Credit Bureau v. Commissioner*, 14 B.T.A. 362 (1928), *aff'd*, 37 F.2d 880 (8th Cir.1930). The brokering of business by IIAH creates unfair competition in the marketplace and is of decided disadvantage to non-members. *United States v. American Bar Endowment*, 477 U.S. 105, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986).

We agree with the tax court that the retained commissions earned by IIAH constitute UBTI subject to tax under § 511(a).

## III. ALTERNATIVE ISSUE ON APPEAL

The tax court held that even though IIAH had generated UBTI, it was nevertheless not entitled to deduct, as "ordinary and necessary business expenses" under § 162, or as charitable expenses under § 170, funds expended for educational, convention, and business meetings. We agree.

## IV. CONCLUSION

Federal law has encouraged the formation of business leagues since the inception of the

---

**9.** The tax court's opinion states:

Petitioner's [IIAH] share of these commissions represents practically all of petitioner's operating income ... petitioner submitted a detailed breakdown of activities which indicated that 33.8 percent of time spent was related to its public insurance activity ... For the years in issue ... approximately 29 percent of time spent was related to its public insurance activi-

ty ... Here ... the insurance needs of the public authorities were not placed on the open market for bids. Rather, the Committee merely assigned public accounts to a member agency ... fail[ing] to prove that the public authorities receiving insurance through petitioner were receiving the best insurance at the lowest overall cost....

federal income tax. Congress has recognized the benefit that the public derives from income tax exemption incentives for business leagues and trade associations when their activities are conducted, not for their own sakes, but for the mutual benefit of their members. As a counterbalance, the unrelated business income tax was enacted to eliminate one source of unfair competition by tax-exempt organizations with private industry.

We agree with the tax court that IIAH is engaged in the conduct of a trade or business that is regularly selling public insurance. IIAH has conducted itself in a manner intending to increase profits, rather than in a manner intending to accomplish its exempt purposes. Consequently, the income generated is taxable under § 511. Further, such UBTI shall not be reduced by deductions in excess of those allowed in the notice of deficiency. The decision of the tax court is

AFFIRMED.

RONEY, Senior Circuit Judge, dissenting:

I respectfully dissent. I would reverse the tax court. In my judgment, the decision to tax the income received by the Independent Insurance Agents of Huntsville, Inc. turned not on an accurate application of the unrelated income law but on the conclusion of the tax court that the organization did not perform its tax-exempt purposes very well. If this were a case to revoke the tax-exempt status of the appellant, the government could well be on sound ground. But to retroactively tax as unrelated income the precise income that was predicted in IIAH's approved application for tax-exempt status is a misuse of the unrelated income law.

The income taxed here is the percentage of the commissions which the agency received from its member agents when they wrote insurance for public agencies. One of the purposes for which IIAH was organized was to "[o]versee the writing of insurance for public authorities to ensure that such authorities are receiving the best insurance protection and service available."

The April 1974 application to the IRS specifically stated that IIAH would receive between forty and sixty percent of the commis-

sions earned by its members on such public accounts. In response to this application, the IRS, by letter dated August 23, 1974, expressly acknowledged that "[a] review of your financial statement shows that your income is primarily received from and your expenditures are primarily made with respect to carrying on the public insurance activities."

Nothing much has changed. When the application was being processed, IIAH submitted a detailed breakdown of activities which indicated that 33.8 percent of time spent was related to its public insurance activity. For the years in issue before the tax court, IIAH's breakdown indicated 29 percent of time spent was related to its public insurance activity.

The Exempt Organizations Branch did advise the petitioner that no determination was made concerning whether any present or proposed activities were unrelated trade or business as defined in Section 513. But the tax-exempt status must have been in part based on the fact that the public insurance activities were exempt activities.

The tax court's decision focused on what IIAH did, rather than on what its income came from. The court decided that IIAH failed to prove that it conducted regular independent oversight over the servicing of public accounts, provided the best insurance at the lowest cost to public agencies, removed political influence on the public agencies (there being no showing that there had been political influence under the prior system), provided insurance for difficult-to-insure risks, or coordinated coverage so as to reduce policy gaps and conflicts. There is a great deal of evidence and testimony that IIAH tried to do these things. In fact, IIAH argues on appeal that the tax court was clearly erroneous in its findings as to whether these things were indeed accomplished. Presumably, if IIAH had accomplished these things, the tax court would have held the income related to its tax-exempt purposes. But the test should not be whether the purposes were accomplished, but whether the income received was related to the tax-exempt purposes.

IIAH offered uncontradicted testimony to the tax court to support its assertion that the income it received as commissions from public accounts was substantially related to its tax-exempt purposes of overseeing and servicing those public accounts. Witnesses representing public bodies such as Madison County, the City of Huntsville, and the Huntsville/Madison County Airport Authority, testified that IIAH's servicing of public accounts advanced the public interest, *e.g.*, by enabling public bodies to obtain and evaluate insurers' proposals when those bodies lacked the resources to do so. An IIAH member assigned a public account would try to get suitable coverage through one of the insurance companies that it represented, but if it could not get the coverage that way, the member would contact other carriers, either through fellow IIAH members or directly, in an attempt to get the breadth of coverage needed, as well as the best value. There was also evidence of oversight by IIAH's Association Agency Assignment and Review Committee to ensure that such comparison shopping occurred, although the tax court found the proffered testimony insufficient to establish that such oversight was in fact regularly performed.

Witnesses testified that IIAH had been successful in achieving its goals, and that IIAH's assistance and expertise made it possible for the public bodies to acquire coverage that suited their needs and that saved them money. As emphasized by one IIAH insurance agent, a former chairman of the Review Committee, the best insurance is not necessarily the cheapest insurance. Other factors must be considered such as the financial stability of the insurer and whether a policy provides needed coverage.

The IRS called no witnesses to refute any of the testimony on behalf of IIAH. The undisputed testimony showed that IIAH's income from the public entity insurance was related to the servicing of public accounts in a manner exhibiting a substantial relationship to the organization's tax-exempt purposes.

The fact that IIAH has spent tax-exempt income to provide various benefits for its members is not relevant to the question of whether the activity which produced the income is substantially related to IIAH's tax-exempt purposes. As emphasized by the Court in *United States v. American College of Physicians*, 475 U.S. 834, 849, 106 S.Ct. 1591, 1599, 89 L.Ed.2d 841 (1986), the subject for inquiry is the manner in which the organization operates its business.

Neither the tax court nor the government has cited authority for the proposition that just because a tax-exempt organization fails to accomplish its stated purpose, the income received in connection with that purpose is unrelated income.